IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



MICHAEL JOHN REESE,

    Plaintiff,

v.                                                                                                  Civil Action No. **3:18CV140**

**LT. JACOBS,** *et al.*,

    Defendants.

## MEMORANDUM OPINION

Michael John Reese, a former Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this civil action under 42 U.S.C. § 1983.[1] The action proceeds on Reese's Particularized Complaint ("Complaint," ECF No. 13).[2] In his Complaint, Reese contends that, during his incarceration at the Meherrin River Regional Jail ("MRRJ"), Defendants[3] violated his right to

---

[1] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the spelling, punctuation, and capitalization in the quotations from Reese's submissions.

[3] Reese named the following individuals as defendants: Lt. Jacobs, a lieutenant at MRRJ ("Lieutenant Jacobs"), Captain Lucy, a captain at MRRJ, J.W. Booth, a captain at MRRJ ("Captain Booth"), Brent Wright, Deputy Superintendent at MRRJ ("Deputy Superintendent Wright"), and Robert McCoy, a chaplain at MRRJ ("Chaplain McCoy"). (Compl. 2–4); (*see* ECF No. 26, at 1.) Because Reese failed to serve Chaplain McCoy, the Court dismissed all claims against Chaplain McCoy without prejudice in a separate Memorandum Opinion and Order. (ECF Nos. 35, 36.) This action proceeds against Defendants Lieutenant Jacobs, Captain Lucy, Captain Booth, and Deputy Superintendent Wright (collectively "Defendants").

practice his "Pagan/Wiccan" religion. (Compl. 7.) The Court construes Reese to raise the following claims for relief:

> Claim One: Defendants violated Reese's First Amendment[4] right to the free exercise of religion when they refused to accommodate his request "to set[] up a weekly off housing unit Pagan/Wiccan faith/study group." (*Id.* at 7, 12.)
>
> Claim Two: Defendants' actions violated the Establishment Clause of the First Amendment because Defendants "accommodated Christians [and] refused to do so for any other religious groups[,] [and] [t]hat is a clear endorsement of [and] encouragement to practice their brand of Christianity." (*Id.* at 12–13.)
>
> Claim Three: Defendants violated Reese's Fourteenth Amendment[5] right to equal protection when they upheld Chaplain McCoy's "refusal to accommodate Wiccan/Pagan religion in the same way he did [for] followers of [Christianity]." (*Id.* at 13.)
>
> Claim Four: Defendants placed a substantial burden on Reese's exercise of his religion in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA")[6] when they informed Reese that he "must provide [his] own volunteers to supervise, lead [and] set up off housing unit religious services for 'safety [and] security reasons.'" (*Id.* at 14.)

Reese seeks monetary damages and injunctive relief. (*Id.* at 16–19.)

This matter is before the Court on the Renewed Motion for Summary Judgment filed by Defendants. (ECF No. 43.) Despite the provision of notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Reese has not responded. For the reasons stated below, the Renewed Motion for Summary Judgment (ECF No. 43) will be GRANTED.

---

[4] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

[5] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

[6] 42 U.S.C. § 2000cc–1(a).

# I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)

3

(quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . .").

In support of their Motion for Summary Judgment, Defendants submit the affidavit of Deputy Superintendent Wright ("Wright Aff.," ECF No. 44–1). As noted above, Reese did not respond to Defendants' Renewed Motion for Summary Judgment. Further, Reese did not sign his Complaint under the penalty of perjury. (*See* Compl. 19.) Thus, Reese has put forth no evidence in support of his claims.

In light of the foregoing submissions and principles, the following facts are established for purposes of the Motion for Summary Judgment. The Court draws all permissible inferences in favor of Reese.

## II. UNDISPUTED FACTS

Reese "became an inmate [at MRRJ] on November 4, 2016." (Wright Aff. ¶ 2.) At all times relevant to this action, Reese was an inmate at MRRJ. (*See* Compl. 6, 19.)[7]

"When inmates are processed into MRRJ, they can identify a religion on intake forms so that MRRJ can assess if it needs to inquire regarding any respective inmates' religious dietary needs and worship accommodations." (Wright Aff. ¶ 3.) "MRRJ will query an inmate to determine if the identified religious preference is authentic." (*Id.* ¶ 5.) "MRRJ makes reasonable accommodations to inmates to practice their authentic religious beliefs limited only by legitimate security and operational considerations." (*Id.* ¶ 6.) Upon intake, "Reese identified himself as a follower of Paganism." (*Id.*; *see* Compl. 6.)

Inmates requesting to hold organized religious services "may do so as long as a volunteer from the outside community agrees to lead the service." (Wright Aff. ¶ 9.) "MRRJ does not

---

[7] The Court notes that on April 15, 2019, Reese submitted a Notice of Change of Address, in which he provided a residential address as his "(new) mailing address." (ECF No. 40, at 1.)

employ any religious figure, celebrant, or leader, nor does MRRJ officially recognize any specific religion." (*Id.* ¶ 10.) "All organized religious services at MRRJ are conducted by volunteers from the community outside of MRRJ," (*id.* ¶ 7), and "[a]ny individual leading religious services at MRRJ is done strictly on a voluntary basis." (*Id.* ¶ 10.) "MRRJ requires volunteer outside officiants to lead services to avoid inmates having any position of authority over other inmates." (*Id.* ¶ 11.)

With respect to volunteer outside officiants, Chaplain McCoy serves as "a volunteer pastor for Christian services at MRRJ." (*Id.* ¶ 8; *see id.* at 2 n.2.) Additionally, "volunteers for the Jehovah's Witnesses faith have contacted MRRJ to conduct faith services and have led such services when requested by inmates." (*Id.* ¶ 11.) As a volunteer officiant at MRRJ, Chaplain McCoy has "no supervisory role over any professional staff at MRRJ and [is] not the final decision maker regarding other faith services at MRRJ." (*Id.* ¶ 12; *see id.* at 3 n.3.)

### III. RLUIPA AND FREE EXERCISE

The Court first addresses Reese's RLUIPA claim and First Amendment free exercise claim, which are set forth in Claims Four and One, respectively.

#### A. RLUIPA

In Claim Four, Reese contends that Defendants placed a substantial burden on his exercise of his religion in violation of RLUIPA. (Compl. 14.)

##### 1. Injunctive Relief

Reese is not entitled to pursue a claim for injunctive relief under RLUIPA because Reese's release from incarceration at MRRJ moots his claim for injunctive relief. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (quoting *Powell v. McCormack*,

395 U.S. 486, 496 (1969)). "[F]ederal courts have 'no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Id.* (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)). Thus, "[o]nce an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of the claim."[8] *Id.* at 287. Neither Reese, nor the record, establishes ongoing interference with his practice of his Pagan/Wiccan religion. Reese's demands for injunctive relief with respect to RLUIPA, therefore, are moot and will be DISMISSED. *Id.* at 286–87 (citations omitted) (holding that transfer or release moots claims for injunctive relief).[9]

Moreover, as explained below, Reese fails to demonstrate that Defendants substantially burdened his religious exercise.

### 2. Two-Part Inquiry

RLUIPA provides, in pertinent part, that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person--
> **(1)** is in furtherance of a compelling governmental interest; and
> **(2)** is the least restrictive means of furthering that compelling governmental interest.

---

[8] If Reese were to demonstrate that the action is "capable of repetition, yet evading review," his claim may not be moot. *Incumaa*, 507 F.3d at 289 (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007)). Nevertheless, such a showing requires a "demonstrated probability" that the allegedly improper action "will recur again, and to the same complainant." *Id.* (quoting *Murphy v. Hunt*, 455 U.S. 478, 483 (1982)). That showing is not made here.

[9] The Court notes that Reese's request for injunctive relief with respect to his other claims is also moot and will be DISMISSED.

42 U.S.C. § 2000cc–1(a). Thus, to begin, Reese must demonstrate that Defendants' actions imposed a "substantial burden" on the exercise of his religion. To determine whether Reese has met this standard, the Court must answer two questions: "(1) Is the burdened activity 'religious exercise,' and if so (2) is the burden 'substantial?'" *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004); *see Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir. 2012) (employing similar two-part inquiry).

### a. Whether The Burdened Activities Are a Religious Exercise

"RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Couch*, 679 F.3d at 200 (quoting 42 U.S.C. § 2000cc–5(7)(A)). Reese's claim implicates his ability to participate in group Pagan/Wiccan religious services "off [of the] housing unit." (Compl. 7.) Given RLUIPA's broad definition of religious exercise, the Court will assume that this activity constitutes religious exercise. *See, e.g., Whitehouse v. Johnson*, No. 1:10CV1175 (CMH/JFA), 2011 WL 5843622, at *3 (E.D. Va. Nov. 18, 2011) (assuming inmate's enrollment in seminary course constituted religious exercise for purposes of RLUIPA).

### b. Reese Fails To Demonstrate A Substantial Burden On His Religious Exercise

RLUIPA does not define the term "substantial burden." *See Couch*, 679 F.3d at 200. The United States Court of Appeals for the Fourth Circuit determined that the Supreme Court's jurisprudence interpreting the Free Exercise Clause provides guidance on the issue. *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). Thus, the Fourth Circuit has explained that a substantial burden:

> is one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the

> precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion . . . on the other hand.

*Couch*, 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace*, 472 F.3d at 187). To meet the substantial burden component of the test, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger v. Brown*, 496 F. App'x 322, 325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). "[A]t a minimum," however, "the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004));[10] *see Krieger*, 496 F. App'x at 326 (affirming grant of summary judgment where inmate failed to "show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs." (citing *Lovelace*, 472 F.3d at 187)). Thus, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Two decisions issued by the Fourth Circuit illustrate a plaintiff's responsibility with respect to demonstrating a substantial burden. In *Couch*, the plaintiff "testified that the primary religious texts of Islam command that he grow a beard and that the refusal to maintain a beard is a sin comparable in severity to eating pork." *Couch*, 679 F.3d at 200. The VDOC's grooming policy prohibited inmates from growing beards and enforced this rule by placing a noncompliant inmate

---

[10] In *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), the Supreme Court abrogated *Smith*'s ultimate holding that RLUIPA allows for monetary damages against state officials acting in their official capacity.

in a program that "restricted or limited [the inmate's] access to personal property, movement rights, the right to eat and associate with others, recreation time, and visitation time." *Id.* at 199. The Fourth Circuit concluded that VDOC's grooming policy and enforcement mechanism "fit squarely within the accepted definition of 'substantial burden'" because it placed substantial pressure on the plaintiff to modify his behavior and violate his beliefs. *Id.* at 200–01 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 995–96 (9th Cir. 2005)).

In *Krieger*, the Fourth Circuit declined to find that an inmate had demonstrated a substantial burden where prison officials denied "his requests for an 'outdoor worship circle' and certain 'sacred items' related to his religious practice of Asatru." *Krieger*, 496 F. App'x at 322–23. The inmate-plaintiff "asserted that deprivation of the outdoor worship circle would require him to pray indoors, and that the 'Blot' ceremony is '*best* performed outdoors.'" *Id.* at 325 (emphasis added). The Fourth Circuit concluded that the mere denial of the optimal manner for performing the "Blot" ceremony could not demonstrate a substantial burden where the plaintiff "failed to offer any explanation regarding the reason why indoor worship would compromise his religious beliefs." *Id.*

*Krieger* illuminates another consideration in conducting the substantial burden inquiry. The availability to an inmate, in the most general sense, of other means to practice his or her faith is not relevant to the RLUIPA substantial burden inquiry. *See id.*; *see also Al–Amin v. Shear*, 325 F. App'x 190, 193 (4th Cir. 2009). "Nevertheless, courts properly consider whether the inmate retains other means for engaging in the particular religious activity, such as the 'Blot' ceremony, in assessing whether a denial of the inmate's preferred method for engaging that religious exercise imposes a substantial burden." *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013) (citing *Krieger*, 496 F. App'x at 326; *Coleman v. Governor of Mich.*,

413 F. App'x 866, 875–76 (6th Cir. 2011)). Applying these principles, the United States Court of Appeals for the Eighth Circuit has held that an inmate failed to demonstrate that the denial of additional group study time imposed a substantial burden upon his religious exercise where prison officials already provided three hours of group study and worship time and allowed the inmate to study in his cell. *Van Wyhe v. Reisch*, 581 F.3d 639, 656–57 (8th Cir. 2009). Similarly, the United States Court of Appeals for the Sixth Circuit concluded that prison policies which limited the inmates' access to religious radio and television broadcasts failed to substantially burden the inmates' religious exercise because the inmates "may receive religious literature via the mail and may receive visitors at the prison to discuss their religious beliefs." *Coleman*, 413 F. App'x at 876. As explained below, in light of the foregoing principles, Reese has not demonstrated any substantial burden upon his religious exercise with respect to Claim Four.

In Claim Four, Reese contends that Defendants substantially burdened his exercise of his religion by failing to provide, and denying Reese's requests for, "a weekly off housing unit Pagan/Wiccan faith/study group." (Compl. 7.)

The evidence before the Court establishes that inmates requesting to hold organized religious services "may do so as long as a volunteer from the outside community agrees to lead the service." (Wright Aff. ¶ 9.) This applies to all organized religious services, meaning that "[a]ll organized religious services at MRRJ are conducted by volunteers from the community outside of MRRJ," (*id.* ¶ 7), and "[a]ny individual leading religious services at MRRJ is done strictly on a voluntary basis." (*Id.* ¶ 10.) "MRRJ requires volunteer outside officiants to lead services to avoid inmates having any position of authority over other inmates." (*Id.* ¶ 11.)

Reese contends that he requested that Chaplain McCoy "assist [him] in setting up a weekly off housing unit Pagan/Wiccan faith/study group," and that his request for assistance from

Chaplain McCoy was denied. (Compl. 7–8.) Reese also contends that Chaplain McCoy indicated that, in accessing Reese's request for assistance, Chaplain McCoy had "consulted" with Lieutenant Jacobs. (*Id.* at 7.) Additionally, Reese faults Lieutenant Jacobs, Captain Lucy, Captain Booth, and Deputy Superintendent Wright for upholding and approving Chaplain McCoy's denial of Reese's request for Chaplain McCoy's assistance. (*See id.* at 7–11, 13–14.)

The record before the Court, however, establishes that Chaplain McCoy serves as "a volunteer pastor for Christian services at MRRJ." (Wright Aff. ¶ 8; *see id.* at 2 n.2.) The record also establishes that inmates at MRRJ, such as Reese, who request to hold organized religious services "may do so as long as a volunteer from the outside community agrees to lead the service." (Wright Aff. ¶ 9.) Thus, Chaplain McCoy's denial of Reese's request for his assistance, and the other Defendants' approval of Chaplain McCoy's denial, did not prevent Reese from participating in organized religious services with a different outside volunteer.

Further, the record establishes that MRRJ's volunteer requirement applies to *all* organized religious services at MRRJ. (*See id.* ¶ 7.) Thus, "[b]ecause the volunteer policy was implemented uniformly [at MRRJ], it was not the policy imposing the burden on [Reese's] religious practice, but instead the lack of qualified volunteers." *Brown v. Collier*, 929 F.3d 218, 231 (5th Cir. 2019) (first alteration in original) (quoting *Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 614 (5th Cir. 2008)); *Adkins v. Kasper*, 393 F.3d 559, 571 (5th Cir. 2004) (discussing that with respect to a jail's policy that required an outside volunteer to hold group religious services, the lack of opportunity for group religious services resulted "not from some rule or regulation that directly prohibits such gatherings," but "from a dearth of qualified outside volunteers available to go to [the jail]"); *see Wright v. Lassiter*, 921 F.3d 413, 419 (4th Cir. 2019) ("concluding 'a lack of outside clergy, volunteer visitors, and practicing co-religionists in the prison,' not decision to

transfer the plaintiff to a different prison, had caused the burden on plaintiff's religious exercise" (quoting *Bader v. Wrenn*, 675 F.3d 95, 98 (1st Cir. 2012)).

For these reasons, Reese has failed to demonstrate that Defendants imposed a substantial burden on his religious exercise. Accordingly, because Reese has offered no evidence that Defendants imposed a substantial burden on his religious exercise, Claim Four will be DISMISSED.

### B. Free Exercise

In Claim One, Reese contends that Defendants violated his First Amendment right to the free exercise of his religion by engaging in the same action set forth in Claim Four (i.e., by refusing to accommodate Reese's request "to set[] up a weekly off housing unit Pagan/Wiccan faith/study group"). (Compl. at 7, 12.)

In order for Reese to survive summary judgment on the First Amendment claim, Reese must demonstrate that Defendants' conduct substantially burdened his religious exercise. *Whitehouse*, 2011 WL 5843622, at *5. "RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States." *Id.* (citing *Lovelace*, 472 F.3d at 186). Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van Wyhe*, 581 F.3d at 657–58 (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)). As explained above, Reese has failed to demonstrate a substantial burden on his religious exercise. Accordingly, Claim One will be DISMISSED.

## IV. ESTABLISHMENT OF RELIGION

"The Establishment Clause prohibits state action with a sectarian legislative purpose or with the primary effect of advancing religion, including fostering an 'excessive government entanglement' with religion." *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971)). In analyzing Establishment Clause challenges, the Supreme Court often applies the *Lemon* test. *See Van Orden v. Perry*, 545 U.S. 677, 685–86 (2005) (citing *Lemon*, 403 U.S. at 612–13). In *Lemon*, the Supreme Court set forth the following three-part test: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Lemon*, 403 U.S. at 612–13 (internal citation omitted) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)).

In *Van Orden v. Perry*, however, the Supreme Court noted that "[m]any of the [Supreme Court's] recent cases simply [had] not applied the *Lemon* test." *Van Orden*, 545 U.S. at 686 (citations omitted) (discussing that "just two years after *Lemon* was decided, [the Supreme Court] noted that the factors identified in *Lemon* serve as 'no more than helpful signposts.'" (quoting *Hunt v. McNair*, 413 U.S. 734, 741 (1973)). Furthermore, "[t]he Supreme Court has not directly addressed the standard of review that applies when inmates assert a violation of the Establishment Clause, and more particularly, whether the applicable standard may depend upon the specifics of the claim." *Brown v. Collier*, 929 F.3d 218, 242 (5th Cir. 2019).

In the prison context, claims under the Establishment Clause and the Free Exercise clause are sometimes in tension because "[p]rison officials[] . . . are *required* to facilitate opportunities for prisoners to worship or otherwise exercise religious beliefs even though, outside the prison context, such involvement would undoubtedly implicate Establishment Clause concerns." *Id.*

13

at 244 (emphasis in original). In light of this inherent tension, in *Brown v. Collier*, the United States Court of Appeals for the Fifth Circuit concluded that the standard set forth in *Turner v. Safley*, 482 U.S. 78 (1987), rather than the *Lemon* test, applied "[w]hen policies ostensibly designed to honor the Free Exercise rights of inmates are challenged on the basis that they violate the Establishment Clause because the policies favor one or more faith groups over another." *Brown*, 929 F.3d at 244; *see Firewalker-Fields v. Lee*, No. 7:17–cv–00400, 2019 WL 4783112, at *8 (W.D. Va. Sept. 30, 2019) (applying the *Turner* standard to inmate's Establishment Clause claim).

In applying the *Turner* standard, courts consider (1) whether a "valid, rational connection [exists] between the prison regulation [or managerial decision] and the legitimate governmental interest put forward to justify it," (2) whether "alternative means of exercising the right [exist] that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether an "absence of ready alternatives" to the regulation or managerial decision in question exists. *Turner*, 482 U.S. at 89–90 (citations omitted) (internal quotation marks omitted). The Fifth Circuit explained the rationale underlying the application of the *Turner* standard as follows:

> In attempting to accommodate the religious beliefs of varying faith groups in compliance with the Free Exercise Clause, prison officials must operate within a zone of "reasonableness." If policies meet *Turner*'s reasonableness standard in effectuating the Free Exercise rights of inmates, then those policies should not be pruned or eliminated as a result of higher scrutiny under the Establishment Clause, even if those policies do not treat all faith groups precisely the same. Prison officials have been accorded some flexibility in providing Free Exercise opportunities for inmates. Inmates' opportunities for religious exercise would be diminished if a more restrictive standard were applied to Establishment Clause claims than is applied to Free Exercise claims, when the allegation is that preference has been given to inmates of one or more faiths. If prison policies are in fact balanced and meet the *Turner* standard, those policies are vindicating only what the

First Amendment requires, and such policies do not amount to government involvement in religious matters to such an extent that the Establishment Clause is violated.

*Brown*, 929 F.3d at 244.

Here, in Claim Two, Reese contends that Defendants' actions violated the Establishment Clause of the First Amendment because, with respect to religious services held off of the housing unit, they "accommodated Christians [and] refused to do so for any other religious groups[,] [and] [t]hat is a clear endorsement of [and] encouragement to practice their brand of Christianity." (Compl. 12–13.) Specifically, Reese contends that Defendants permitted Christian inmates to participate in group religious services "in a space off the inmate housing unit," (*id.* at 7), but denied his request to have group religious services "off the housing unit" for Pagan/Wiccan inmates. (*See, e.g., id.* at 9.)

As explained below, however, applying either the *Turner* standard or the *Lemon* test, Reese fails to demonstrate that Defendants' actions violated the Establishment Clause. As an initial matter, Reese has put forth no evidence in support of this claim. Instead, the evidence before the Court establishes that "MRRJ does not employ any religious figure, celebrant, or leader, nor does MRRJ officially recognize any specific religion." (Wright Aff. ¶ 10.) Further, the evidence before the Court establishes that "[a]ll organized religious services at MRRJ are conducted by volunteers from the community outside of MRRJ," (*id.* ¶ 7), and "[a]ny individual leading religious services at MRRJ is done strictly on a voluntary basis." (*Id.* ¶ 10.) The rationale for requiring volunteer outside officiants to lead religious services at MRRJ is "to avoid inmates having any position of authority over other inmates." (*Id.* ¶ 11.)

The Fifth Circuit's application of the *Turner* factors in *Brown* is instructive to the analysis of the *Turner* factors in the present case. *Brown* involved a challenge to a previously entered

consent decree that "exempt[ed] Muslim inmates from the requirement that all religious gatherings and activities in Texas state prisons attended by more than four inmates must be directly supervised by either prison staff or a prison-approved outside volunteer." *Brown*, 929 F.3d at 224. Applying the first *Turner* factor, in *Brown*, the Fifth Circuit concluded that "[t]here is a 'valid, rational connection' between permitting volunteers to provide additional opportunities for the exercise of religious rights and 'the legitimate governmental interest' of prison officials in complying with their obligation to afford 'reasonable op[p]ortunities . . . to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s].'" *Id.* at 245 (second and third alterations, and omission in original) (footnotes omitted) (quoting *Turner*, 482 U.S. at 89; *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)). This conclusion regarding the first *Turner* factor is also applicable to the present case because MRRJ's policy regarding volunteer outside officiants "provide[s] additional opportunities for the exercise of religious rights" by inmates. *Id.* (citation omitted). Furthermore, as was the case in *Brown*, the governmental interest or objective in MRRJ's policy "is 'a legitimate and neutral one' that 'operate[s] in a neutral fashion, without regard to the content of the expression.'" *Id.* (alteration in original) (quoting *Turner*, 482 U.S. at 90).

Applying the second *Turner* factor (i.e., "whether there are alternative means of exercising the right," *Turner*, 482 U.S. at 90), in *Brown*, the Fifth Circuit concluded that "[i]f the volunteer policy were eliminated or fewer resources were expended to support volunteer efforts, inmates, including Muslim inmates, would have fewer opportunities for worship and religious study." *Brown*, 929 F.3d at 245–46. Similarly, in the present case, if MRRJ eliminated its volunteer policy, inmates, such as Reese, would have fewer opportunities to engage in religious activities.

Next, applying the third *Turner* factor (i.e., "the impact [of] accommodation of the asserted constitutional right," *Turner*, 482 U.S. at 90), as was the case in *Brown*, "[i]f the volunteer policy

were eliminated as violative of the Establishment Clause, inmates would be adversely impacted," however, conversely, "resources would no longer be spent by [MRRJ] to implement the volunteer program." *Brown*, 929 F.3d at 246.

Finally, applying the fourth *Turner* factor (i.e., whether an "absence of ready alternatives" to the regulation or managerial decision in question exists, *Turner*, 482 U.S. at 90), "[t]he alternatives to allowing volunteers into [MRRJ] to facilitate religious worship and study include excluding the volunteers or paying other individuals to replace them." *Brown*, 929 F.3d at 256. As the Fifth Circuit explained in *Brown*, "[t]he first alternative would[] . . . reduce inmates' religious exercise[,] [and] [t]he second would require considerable expenditures." *Id.*

Accordingly, applying the *Turner* factors, the Court concludes that MRRJ's "volunteer policy and the resources expended to implement it are reasonably related to [MRRJ's] obligation to afford inmates reasonable opportunities to exercise religious freedom." *Id.*

Moreover, applying the *Lemon* test, because MRRJ's volunteer policy applies to *all* religious services, MRRJ "neither advances nor inhibits religion," *Lemon*, 403 U.S. at 612 (quoting *Bd. of Educ. v. Allen*, 392 U.S. 236, 243 (1968)), and MRRJ does "not foster 'an excessive government entanglement with religion'" because inmates of all religions must adhere to this policy. *Id.* at 613 (quoting *Walz*, 397 U.S. at 674).

Thus, for these reasons, Reese fails to demonstrate that Defendants' actions violated the Establishment Clause. Accordingly, Claim Two will be DISMISSED.

## V. EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment commands that similarly situated persons be treated alike. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To survive summary judgment, Reese

must demonstrate: (1) "that he has been treated differently from others with whom he is similarly situated"; and, (2) that the differing treatment resulted from intentional discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If a plaintiff satisfies the above, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* (citations omitted). "In a prison context," disparate treatment passes muster so long as "the disparate treatment is 'reasonably related to [any] legitimate penological interests.'" *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) (alteration in original) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)).

In Claim Three, Reese contends that Defendants violated his Fourteenth Amendment right to equal protection when they upheld Chaplain McCoy's "refusal to accommodate Wiccan/Pagan religion in the same way he did [for] followers of [Christianity]." (Compl. 13.) Specifically, Reese contends that he was denied the ability to "set[] up a weekly off housing unit Pagan/Wiccan faith/study group in the same space [and] manner that [Chaplain McCoy] was at that time, doing for Christian inmates." (*Id.* at 7.) Reese asserts that when Chaplain McCoy "refus[ed] to accommodate Wiccan/Pagan religion in the same way he did [for] followers of his own religion, it [was] clearly his religious bias that [was] motivating his actions" and "he is clearly of a discriminatory mindset towards [Reese's] religion." (*Id.* at 13.) Additionally, Reese contends that by "upholding [Chaplain McCoy's] clearly discriminatory actions, [all Defendants] themselves are exhibiting a discriminatory intent." (*Id.*) Further, Reese contends that "when we are unobserved, [Lieutenant Jacobs] makes religiously bigoted statements," and Lieutenant Jacobs told Reese that "[his] religion [was] evil." (*Id.* at 11.)

Besides Reese's conclusory allegations, however, he has put forth no evidence in support of Claim Three. Furthermore, although Reese contends that Lieutenant Jacobs made "religiously

18

bigoted statements," (*id.*), he fails to proffer any evidence demonstrating that Lieutenant Jacobs's statements resulted in the denial of his request for group Pagan/Wiccan religious services. Instead, the evidence submitted by Defendants establishes that inmates, such as Reese, may request to hold organized religious services "as long as a volunteer from the outside community agrees to lead the service." (Wright Aff. ¶ 9.) Reese provides no evidence to demonstrate that any alleged "unequal treatment was the result of intentional or purposeful discrimination." *Morrison*, 239 F.3d at 654. Accordingly, Claim Three will be DISMISSED.

## VI. CONCLUSION

For the foregoing reasons, Defendants' Renewed Motion for Summary Judgment (ECF No. 43) will be GRANTED. Reese's claims will be DISMISSED. The action will be DISMISSED.

An appropriate Final Order shall accompany this Memorandum Opinion.

/s/
John A. Gibney, Jr.
United States District Judge

Date: 16 March 2020
Richmond, Virginia